# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 22, 2023

Lyle W. Cayce
Clerk

————————

No. 22-50164

————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Arturo Shows Urquidi; Mario Iglesias-Villegas

*Defendants—Appellants*.

———————————————————————

Appeals from the United States District Court
for the Western District of Texas
USDC No. 3:12-CR-849-14
USDC No. 3:12-CR-849-19

———————————————————————

Before King, Jones, and Duncan, *Circuit Judges*.

King, *Circuit Judge*:

Defendants were among 24 individuals indicted on various charges in connection with their involvement in the Sinaloa Cartel. Defendants were jointly tried during a 10-day jury trial. Arturo Shows Urquidi was convicted on five counts, while Mario Iglesias-Villegas was convicted on 12 counts. Each received concurrent life sentences for all counts on which they were convicted. Defendants raise various challenges to their respective convictions and sentences on appeal. We AFFIRM the convictions but

No. 22-50164

VACATE those sentences that exceed their respective statutory maxima and REMAND the case for resentencing on those counts only.

## I.

On April 11, 2012, Defendants-Appellants Arturo Shows Urquidi and Mario Iglesias-Villegas (together, the "Defendants") were among 24 individuals who were indicted in connection with their affiliation and dealings with the Sinaloa Cartel (alternatively, the "Cartel"). Defendants were tried together during a 10-day jury trial, which concluded on October 21, 2022.

The Sinaloa Cartel is a criminal organization whose members and associates engage in the illegal trafficking of cocaine and marijuana from Mexico into the United States. Drug proceeds accrued in the United States are secretly transported back to Mexico and into the Cartel's coffers. Cartel members frequently engage in violence—such as murder, torture, and kidnapping—against rivals, those they deem responsible for lost or stolen assets, and individuals cooperating with law enforcement, among others. These acts of violence, which also include the mutilation and dismemberment of victims' bodies, are often publicized by the Cartel as a means of intimidation.

The Sinaloa Cartel has a hierarchical structure and was led by Joaquin "El Chapo" Guzman Loera and Ismael "El Mayo" Zambada Garcia during the events that were recounted at trial.[1] Below Chapo and Mayo were "plaza bosses" who managed the Cartel's daily operations in each major city within its network. These operations included moving and importing drugs,

---

[1] After multiple escapes from Mexican authorities, Chapo was eventually extradited to the United States in 2017 and sentenced to five concurrent life sentences plus 30 years in 2019; his conviction was later affirmed by the Second Circuit. *See generally United States v. Guzman Loera*, 24 F.4th 144 (2d Cir. 2022), *cert. denied sub nom. Loera v. United States*, 142 S. Ct. 2780 (2022).

accounting for the cash proceeds returned from drug sales in the United States, acquiring weapons, and managing "sicarios," *i.e.*, Cartel assassins. Under the plaza bosses were Cartel members in charge of individual "offices" (sometimes referred to as "houses," "safe houses," or "safety houses"), where meetings were held; drugs, cash, and firearms were stored; money was counted; and individuals were kidnapped, tortured, and murdered. Beneath the office heads were rank-and-file members of the Cartel who served as sicarios, provided security, paid bribes, packaged or transported drugs, and counted money, among other Cartel duties.

On October 22, 2022, the jury found both Shows Urquidi and Iglesias-Villegas guilty of Racketeering Conspiracy, Conspiracy to Possess a Controlled Substance with Intent to Distribute, Conspiracy to Import a Controlled Substance, Conspiracy to Launder Monetary Instruments, and Conspiracy to Possess Firearms in Furtherance of Drug Trafficking Crimes (Counts I through V). Iglesias-Villegas was also found guilty of five counts for Violent Crimes in Aid of Racketeering (Counts VI through X), Conspiracy to Kill in a Foreign Country (Count XIII), and Kidnapping and Aiding and Abetting Kidnapping (Count XIV). On March 3 and March 24, 2022, Shows Urquidi and Iglesias-Villegas were sentenced to concurrent life sentences on each count of conviction. Iglesias-Villegas was also fined $100,000. Defendants raise various issues on appeal that span from pre-trial discovery through their sentencing. We address each issue in turn.

## II.

Iglesias-Villegas argues that the district court erred in denying his pre-trial motion for the disclosure of evidence presented to the grand jury supporting the indictment as it related to him.

We review the denial of a motion for the disclosure of grand jury materials for an abuse of discretion. *United States v. Miramontez*, 995 F.2d 56, 59 (5th Cir. 1993).

"Federal courts long have recognized that secrecy is essential to maintaining the integrity of the grand jury system." *In re Grand Jury Testimony*, 832 F.2d 60, 62 (5th Cir. 1987). Nevertheless, a court may authorize the disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). "The burden is on the party seeking disclosure to show that 'a particularized need' exists for the materials that outweighs the policy of secrecy." *Miramontez*, 995 F.2d at 59 (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)). To meet this burden, the seeking party must demonstrate that "(1) the material he seeks is needed to avoid a possible injustice . . . , (2) the need for disclosure is greater than the need for continued secrecy, and (3) his request is structured to cover only material so needed." *Id.*; *see also United States v. Madrid*, 610 F. App'x 359, 373 (5th Cir. 2015) (per curiam).

Iglesias-Villegas asserts that the grand jury transcripts were necessary to prove that his case is one of mistaken identity. The indictment incorrectly names him as Mario Alberto Iglesias-Villegas. Throughout this case, Iglesias-Villegas has maintained that Mario Alberto Iglesias-Villegas refers to his now-deceased cousin Mario Alberto Iglesias-Chavaria and not himself. In his motion below, Iglesias-Villegas argued that he needed the grand jury materials so that he could "become aware whether he was indicted *via* allegations to the grand jury of conduct that was attributable to his cousin" and "determine whether a ground may exist to dismiss the indictment." The district court rejected this argument, reasoning that Iglesias-Villegas failed to establish that there was any confusion between his identity and that of his

4

No. 22-50164

cousin at the time of the indictment or that the Government engaged in misconduct while presenting its case to the grand jury.

This was not an abuse of discretion. "We have 'refuse[d] to adopt the proposition that, absent perjury or government misconduct, an indictment is flawed simply because it is based on testimony that may later prove to be questionable.'" *United States v. Cessa*, 861 F.3d 121, 142 (5th Cir. 2017) (alteration in original) (quoting *United States v. Sullivan*, 578 F.2d 121, 124 (5th Cir. 1978)). "[W]hen a defendant claims that the prosecution put false information before the grand jury, we ask two questions (1) did the government 'knowingly []sponsor[]' false information before the grand jury and (2) was that information material, that is, was the information 'capable' of influencing the grand jury's decision." *Id.* (quoting *United States v. Strouse*, 286 F.3d 767, 771–72 (5th Cir. 2002)). Iglesias-Villegas speculates that the Government did not present accurate evidence to the grand jury due to its purported confusion between his identity and that of his cousin. But he does not allege that the Government intended to deceive the grand jury to the extent that any confusion existed. Without more, confusion alone does not amount to the knowing sponsorship of false information. Furthermore, his argument that the district court should have granted him access to the grand jury materials so he could "determine what information the government had presented and . . . whether the indictment had been influenced by any misconduct" establishes that he cannot demonstrate that any false information was actually presented to the grand jury. Iglesias-Villegas thus cannot show that a possible injustice could have been avoided.[2]

---

[2] Although not dispositive to our analysis, the materiality of this purported false information is also suspect. The indictment is replete with allegations regarding Iglesias-Villegas's culpability that were re-alleged at trial in greater detail and bolstered by additional evidence. Nevertheless, during his closing arguments, Iglesias-Villegas continued to assert that his was a case of mistaken identity despite multiple witnesses

No. 22-50164

## III.

Iglesias-Villegas also challenges the district court's denial of his motion to suppress statements that he made to DEA Special Agent Juan Briano while in Mexican custody.

For a denial of a motion to suppress, we review factual findings for clear error and legal conclusions, including "whether *Miranda*'s guarantees have been impermissibly denied," *de novo*. *United States v. Nelson*, 990 F.3d 947, 952 (5th Cir. 2021). We evaluate evidence in a light most favorable to the party that prevailed below and will uphold the district court's ruling "if there is any reasonable view of the evidence to support it." *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (quoting *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)). "Our review is 'particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witnesses.'" *United States v. Lim*, 897 F.3d 673, 685 (5th Cir. 2018) (quoting *United States v. Ortiz*, 781 F.3d 221, 226 (5th Cir. 2015)).

## A.

On April 19, 2012, shortly after the indictment in this case was filed, a group of agents from both the DEA and FBI interviewed Iglesias-Villegas, who was being held in Mexican custody after being arrested. Iglesias-Villegas was informed that he had been indicted and that the purpose of this meeting was to seek his cooperation for an interview. After some initial hesitation, Iglesias-Villegas began to cooperate, confirming his aliases; Delta, Delfin, and Dos; and admitting to working for Jose Antonio Torres Marrufo, a plaza

---

testifying to the contrary. This theory was rejected by the petit jury, which found Iglesias-Villegas guilty on all counts. And Iglesias-Villegas does not challenge the petit jury's verdict to the extent it rejected his mistaken identity theory.

boss for the Sinaloa Cartel in Juarez, Mexico. He admitted to being a sicario and operating a Cartel office in Juarez where there were between 30 and 35 other sicarios under his command. He also admitted to being involved in three incidents that he recounted to Agent Briano and which became central components of the Government's case against him at trial.

The first incident concerned an operation ordered by Marrufo in which a bridegroom, his brother, and his uncle were all to be kidnapped from a church in Juarez during the bridegroom's wedding and brought to another location where they would be interrogated and eventually killed (the "Wedding Murders"). Iglesias-Villegas told Agent Briano that Marrufo had instructed him to assist the principal coordinator of the operation, Rafael Figueroa-Merino. Figueroa-Merino initially wanted to kill the three men inside the church, but Iglesias-Villegas explained to Agent Briano that he disagreed with this approach due to his respect for the church and persuaded Figueroa-Merino to kidnap them instead.

The second incident concerned the kidnapping of Sergio Saucedo in Horizon City, Texas (the "Horizon City Kidnapping"). After being kidnapped, Saucedo was secreted across the border to Juarez by associates of Gabino Salas, the plaza boss in El Valle de Juarez, Mexico. From there, Salas's associates handed Saucedo over to individuals working for Marrufo via a roadside exchange. Iglesias-Villegas told Agent Briano that he picked up Marrufo and brought him to the office where Saucedo was being held so that Saucedo could be interviewed by Marrufo. After the interview, Saucedo was killed and several sicarios "dump[ed] the corpse in Ciudad Juarez."

The third incident involved the murder of two men, one of whom was an FBI informant, at an Xtreme Car Wash in Juarez (the "Xtreme Car Wash Murders"); Marrufo had instructed Iglesias-Villegas to arrange for the murders. The murders were reported by the Mexican news media and later

confirmed in greater detail at trial. Iglesias-Villegas provided Agent Briano with further details of Marrufo's operations regarding smuggling drugs into the United States, smuggling cash from drug proceeds back into Mexico, and Marrufo's source for assault weapons. And he described the relationships he had with contacts in Mexican law enforcement with whom he shared information about rival cartels. Specifically, Iglesias-Villegas recalled riding around Mexico with his contacts in their state-issued vehicles and coordinating with them to frame rival cartels.

Before trial, Iglesias-Villegas moved to suppress the statements he made during his interview with Agent Briano. At the suppression hearing, Iglesias-Villegas testified[3] that on March 17, 2012, he was arrested by Mexican federal police, handcuffed, and moved into an unmarked car so that he could be transported to the prosecutor's office. While in this car, he claimed that the police beat him on the side of his ribs with their rifles and smacked him with their open hands on his neck. Once they had arrived at the office, he was told that his mother and wife would be arrested if he did not sign documents that were presented to him. He testified that he signed the documents without having an opportunity to review them because he "felt cornered" and that his mother and wife would be "in the crosshairs" of Mexican authorities otherwise. Iglesias-Villegas was then taken to a hotel, where he was detained for over a month. While detained at the hotel, he shared a room with four other people who had been arrested and was only allowed to leave the room to eat. He was in line to receive a visit from his

---

[3] Iglesias-Villegas only testified for the purpose of his motion to suppress. *See Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."); *United States v. Harrison*, 461 F.2d 1127, 1131–32 (5th Cir. 1972) (applying *Simmons*'s reasoning to the Fifth Amendment).

mother and wife when he was notified by an agent that he was to go to the prosecutor's office. Iglesias-Villegas was then taken out of line, handcuffed, and driven to the office; he was not told why he was being taken there.

When Iglesias-Villegas arrived at the prosecutor's office, the prosecutor informed him that U.S. agents wanted to speak with him. No one ever asked if he wanted to speak with the agents. He testified that he felt as if he had no choice and would be beaten again if he refused. He was eventually escorted into an office with glass walls and sat at the head of a long table alone with the U.S. agents. One of the U.S. agents then attempted to close the door but was stopped by a Mexican agent looking after Iglesias-Villegas. The door was kept open throughout the interview while the Mexican agent sat outside beside the door and within earshot. Iglesias-Villegas admitted that no threats or promises were ever made by any of the agents, and he agreed that he was "treated with respect." Agent Briano testified that the agents attempted to read Iglesias-Villegas his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and "explain . . . what his U.S. Constitutional rights were in the United States" but that Iglesias-Villegas said he "didn't want to hear it" and "scoffed and backed off the seat." Iglesias-Villegas disputes that he was ever given *Miranda* warnings and testified that he was never provided with a form explaining his extraterritorial rights. The interview lasted no longer than an hour and a half and was terminated by Iglesias-Villegas, who said that he would continue to cooperate after speaking with his attorneys. Iglesias-Villegas was released from Mexican custody on May 6, 2012, about two-and-a-half weeks after the interview.

Iglesias-Villegas argues that the statements he made during this interview should have been suppressed pursuant to the Fifth Amendment because they were given involuntarily and because he was not adequately advised of his *Miranda* rights.

No. 22-50164

## B.

"Whether a confession is admissible or not turns on whether it was made voluntarily." *United States v. Cantu-Ramirez*, 669 F.3d 619, 624 (5th Cir. 2012). An individual makes an involuntary statement if, due to state action, *see Colorado v. Connelly*, 479 U.S. 157, 167 (1986), "his will has been overborne and his capacity for self-determination critically impaired," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). A court considers whether a confession was voluntary based on a totality of the circumstances, which include the length of detention, length of questioning and its location, the use of physical punishment, and whether the accused is informed of his constitutional rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993); *Schneckloth*, 412 U.S. at 226.

Here, Iglesias-Villegas contends that his confession was a product of coercion. He argues that he would not have submitted to the interview with U.S. agents if given a choice. Additionally, he asserts that he was fearful of an "impending threat of violence" by Mexican law enforcement if he did not engage with Agent Briano's questions. But we fail to see such a threat. Iglesias-Villegas concedes that he had not been beaten by Mexican law enforcement since his arrest, which occurred over a month prior to the interview. By the time of his interview, too much time had elapsed from the initial beating for Iglesias-Villegas to credibly fear retaliation for failing to engage with the U.S. agents. He does not allege that he was beaten or threatened by Mexican authorities since his arrest. Without more, we cannot conclude that there was a looming threat of violence if Iglesias-Villegas chose not to cooperate with the U.S. agents. Other facts surrounding the interview support this conclusion. Iglesias-Villegas never evinced any fear of the U.S. agents conducting the interview; indeed, he acknowledged that they treated him with respect. We also credit the district court's finding that Iglesias-Villegas was advised of his extraterritorial rights and that his testimony to the

10

No. 22-50164

contrary was not credible. Furthermore, he terminated the interview on his own volition by stating that he would like to speak with his attorneys before continuing, demonstrating both that he was cognizant of his rights and felt comfortable exercising them. And although a Mexican agent remained within earshot of the interview, Iglesias-Villegas cannot point to any evidence that this amounted to anything more than a standard security measure. Lastly, there is no indication that anything else concerning the environment in which the interview occurred, *i.e.*, the location or duration of the interview, was inherently coercive. Accordingly, considering the totality of the circumstances, we hold that Iglesias-Villegas's confession was voluntary.

## C.

*Miranda* warnings are necessary during a custodial interrogation for a suspect's statements to later be admissible in compliance with the Fifth Amendment. *United States v. Coulter*, 41 F.4th 451, 456 (5th Cir. 2022). "A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988)). Put more succinctly: "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "'[W]hether a suspect is "in custody" is an objective inquiry' that 'depends on the "totality of the circumstances."'" *Wright*, 777 F.3d at 774–75 (alteration in original) (citation omitted) (first quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011); and then quoting *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012)). Although "no one fact is determinative," we have "repeatedly considered certain key details when analyzing whether an individual was or was not in custody," including "the length of the questioning"; "the location

of the questioning"; "the accusatory, or non-accusatory, nature of the questioning"; "the amount of restraint on the individual's physical movement"; and "statements made by officers regarding the individual's freedom to move or leave." *Id.* at 775.

In *Howes v. Fields*, the Supreme Court ruled that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." 565 U.S. 499, 510–11 (2012). Three reasons undergirded the Court's holding in *Howes*: (1) "[i]n the paradigmatic *Miranda* situation . . . detention represents a sharp and ominous change, and the shock may give rise to coercive pressures," whereas "a person who is already serving a term of imprisonment . . . usually [experiences] no such change" due to their already being acclimated to the "ordinary," albeit "unpleasant," restrictions of prison life at the time of the interrogation; (2) "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release"; and (3) "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* at 511–12.

Iglesias-Villegas argues that *Howes* is inapplicable to his case, making the conclusory assertion that he had good reason to think that speaking with U.S. agents would affect the conditions and length of his custody and pointing to his release 17 days later. But his invocation of subjective beliefs and post-hoc rationalizations are unavailing. Iglesias-Villegas's detention was sufficiently analogous to the detention contemplated in *Howes* that it, without more, cannot be adjudged as *per se* custodial for the purpose of *Miranda*. A reasonable person would be aware that U.S. agents likely lack the authority to effect a release from detention from an independent sovereign. Consequently, despite not being sentenced to a term of years, there would be little incentive for a reasonable person in Iglesias-Villegas's carceral state to

be lured into speaking in the hope of securing his prompt release. And an individual who is placed in detention for over a month (and given no indication as to when or whether he will be released) more closely resembles a prisoner serving a term of years that is already acclimated to prison life rather than the paradigmatic *Miranda* suspect who has yet to adjust to the sharp and ominous change of being newly detained.

The remaining circumstances surrounding the interview support a determination that Iglesias-Villegas was not in custody. Despite originally not being given a choice to attend the interview, Iglesias-Villegas was informed of his extraterritorial rights, including that he did not have to speak with the U.S. agents, and that if he decided to answer their questions, he had the right to stop answering questions at any time. *See Howes*, 565 U.S. at 514–15 (although "respondent did not invite the interview," this was "[m]ost important[ly]" offset by him being told that "he could leave and go back to his cell whenever he wanted"); *Coulter*, 41 F.4th at 461 ("[A]ssurances that a suspect '[is] not under arrest and that he [is] free to leave' weigh in favor of determining that a suspect is not in custody." (second and third alterations in original) (quoting *Wright*, 777 F.3d at 777)). He later evinced an understanding of those rights when he terminated the interview on his own and stated that he would like to speak with his attorneys before continuing further. And the U.S. agents treated him with respect throughout the interview, which lasted no longer than 90 minutes and took place in a non-hostile office environment. *See Howes*, 565 U.S. at 515 (suspect-prisoner was not in custody where interview lasted between five and seven hours and occurred in a "well-lit, average-sized conference room"); *see also United States v. Arellano-Banuelos*, 927 F.3d 355, 361–63 (5th Cir. 2019) (inmate serving state prison sentence not in custody while being interviewed by ICE agents where he was not told before arriving that he could decline the interview or was otherwise free to leave, was not provided with full *Miranda*

No. 22-50164

warnings but was told that his statement had to be voluntary and that the interview would terminate if he chose not to speak with the ICE agents, was treated with respect by the ICE agents, and was told by those agents that the time he might spend in ICE detention might be reduced if he cooperated).[4]

## IV.

Shows Urquidi argues that numerous Government exhibits were either inadmissible due to their irrelevance or unduly prejudicial nature under Federal Rules of Evidence 402 and 403, respectively. He concedes, however, that he did not object to the admissibility of most of these exhibits during the trial.

Evidentiary holdings subject to timely objections are reviewed for an abuse of discretion. *United States v. Garcia*, 530 F.3d 348, 351 (5th Cir. 2008). "However, the standard for assigning error under Rule 403 is 'especially high' and requires a showing of a 'clear abuse of discretion.'" *United States*

---

[4] The parties disagree as to whether Iglesias-Villegas was handcuffed during the interview, and the district court did not make a finding regarding this fact. But whether Iglesias-Villegas was restrained is not dispositive to our analysis, and we would come to the same conclusion regardless. *See Howes*, 565 U.S. at 509 ("Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010))); *Dolph v. Davis*, 765 F. App'x 986, 991 (5th Cir. 2019) (per curiam) ("[T]here is no clearly established law that *Miranda* warnings must be given whenever an individual is handcuffed.").

Iglesias-Villegas also contends that his statements must be excluded under *United States v. Heller*, which held that a statement made in foreign custody without *Miranda* warnings must be excluded if (1) "the conduct of the foreign officers shocks the conscience of the American court," or (2) "American officials participated in the foreign search or interrogation, or if the foreign authorities were acting as agents for their American counterparts." 625 F.2d 594, 599 (5th Cir. 1980). As we explained earlier in our voluntariness analysis, *see supra* Part III.B, the conduct of Mexican law enforcement with respect to the interview does not shock the conscience of this court; the totality of the circumstances renders Iglesias-Villegas's confession voluntary. We have likewise just concluded that Iglesias-Villegas was not in custody for the purpose of *Miranda*.

*v. Curtis*, 635 F.3d 704, 716 (5th Cir. 2011) (quoting *United States v. Setser*, 568 F.3d 482, 495 (5th Cir. 2009)). "Rare is the appellant who can make that showing." *Id.* "Importantly, we have cautioned that 'Rule 403 . . . is an extraordinary measure because it permits a trial court to exclude concededly probative evidence, and thus it should be used sparingly.'" *United States v. Clark*, 577 F.3d 273, 287 (5th Cir. 2009) (quoting *United States v. Caldwell*, 820 F.2d 1395, 1404 (5th Cir. 1987)). "Accordingly, '[w]hen reviewing this exercise of discretion, we must look at the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect.'" *Id.* (alteration in original) (quoting *Caldwell*, 820 F.2d at 1404).

Unpreserved evidentiary challenges are reviewed for plain error. *United States v. Richard*, 775 F.3d 287, 295 (5th Cir. 2014). "This court finds plain error when: (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights." *United States v. Jasso*, 587 F.3d 706, 709 (5th Cir. 2009) (quoting *United States v. Villegas*, 404 F.3d 355, 358–59 (5th Cir. 2005)). Even if these three prongs are satisfied, whether the error must be remedied is subject to our discretion—this discretion need only be exercised "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). It is Shows Urquidi's burden to establish plain error. *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

Evidence is relevant if it (1) "has any tendency to make a fact more or less probable than it would be without the evidence" and (2) "the fact is of consequence in determining the action." FED. R. EVID. 401. Irrelevant evidence is inadmissible. FED. R. EVID. 402. "The court may exclude relevant evidence if its probative value is substantially outweighed by a

danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

At trial, Shows Urquidi objected to the admissibility of three photographs pursuant to Rule 403. The first two photographs, Exhibits 33-a and 33-b, depict the corpse of a confidential source for the DEA, Edgar Ariel Avalos, who agreed to cooperate against Marrufo and was later killed during the Xtreme Car Wash Murders. Both photographs show Avalos's bullet-riddled body contorted on the floor of a garage with a large amount of blood pooled around his head. Exhibit 33-b is a closeup photograph depicting the same image as Exhibit 33-a. The third photograph, Exhibit 24-o, depicts the dead body of Alonso Sotelo, a friend of the groom who was gunned down as he tried to escape during the Wedding Murders. In the photograph, Sotelo is lying face up on the ground with a bloodied face and arm.

Shows Urquidi now contends that additional evidence should not have been admitted. For example, he cites photographs depicting the body of a dead waiter who had his finger severed and placed in his mouth after he was suspected of losing $250,000 of the Cartel's cocaine. The man who killed the waiter testified that the finger was severed to signal that he was a thief, and it was placed in his mouth to show that he was cooperating with the U.S. government. Shows Urquidi also points to a photograph of Sergio Saucedo following the Horizon City Kidnapping. In that photograph, Saucedo is lying dead on the ground with his severed arms placed on top of his chest. The other photographs that Shows Urquidi now contests are similarly graphic. He also challenges multiple pieces of testimony, including that of the father of the groom who gave his account of the Wedding Murders. Shows Urquidi asserts that all of this evidence—both the evidence he originally objected to and that which he challenges for the first time on appeal—was not relevant

to the crimes for which he was on trial and was otherwise unnecessarily cumulative and unfairly prejudicial.

We disagree. First, because Shows Urquidi challenges this evidence's relevancy for the first time on appeal, he must establish that its admission on this basis was plainly erroneous, which he fails to do. He does not contend that this evidence was wholly irrelevant, but that it was merely irrelevant to the case as it pertained to him. Specifically, he does not assert that this evidence was irrelevant to the Government's case against Iglesias-Villegas, who notably makes no such assertion on his own. Indeed, it appears that the crux of Shows Urquidi's argument is that he was tried together with Iglesias-Villegas, *i.e.*, that evidence relevant only to the case against Iglesias-Villegas could be presented in such close proximity to the case against Shows Urquidi, an issue he raises separately and which we address in Part VI *infra*.

Second, it was not clearly—or plainly—erroneous for the district court to conclude that the probative value of this evidence was not substantially outweighed by it being overly cumulative or unfairly prejudicial. The photographic evidence was critical in proving many of the counts of the indictment. And it supported one of the principal theories of the Government's case: that the Sinaloa Cartel utilized extreme forms of violence as a means of achieving its objectives via intimidation. Nor was it cumulative as it provided support to witness testimony. *See United States v. Perry*, 35 F.4th 293, 325 (5th Cir. 2022) ("gruesome" photographs were admissible where they had "nontrivial probative value" in that they helped prove overt acts committed in furtherance of a conspiracy, lent support to testimony, and established the violence of the crimes committed). The challenged testimony—which is all subject to plain error review—likewise provided the jury with a unique and important perspective as to the Cartel's violence that would otherwise have been solely portrayed through the

testimony of the perpetrators. The value of this testimony thus outweighed any risk of unfair prejudice or having an overly cumulative effect.

## V.

Defendants each challenge the sufficiency of the evidence: Shows Urquidi as to Count I, and Iglesias-Villegas as to Counts IV, VI, and VII.

Properly preserved challenges to the sufficiency of the evidence are reviewed *de novo*, but our review is "highly deferential to the verdict." *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014) (quoting *United States v. Isgar*, 739 F.3d 829, 835 (5th Cir.2014)). The evidence will be deemed sufficient unless no "rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt. In reviewing the evidence presented at trial, we draw all reasonable inferences in favor of the jury's verdict." *Id.* (quoting *United States v. Miles*, 360 F.3d 472, 476–77 (5th Cir. 2004)). The jury, however, "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses." *United States v. Scott*, 892 F.3d 791, 797 (5th Cir. 2018) (quoting *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012)).

If a defendant fails to renew a motion for acquittal after the jury's verdict, then we will only reverse the verdict if there is a "'manifest miscarriage of justice,' which occurs only where 'the record is devoid of evidence pointing to guilt' or the evidence is so tenuous that a conviction is 'shocking.'" *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017) (quoting *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc)).

Both Defendants moved for a judgment of acquittal following the conclusion of the Government's case-in-chief. Because Iglesias-Villegas failed to renew his motion after he presented evidence, his issues are reviewed for a manifest miscarriage of justice. Shows Urquidi did not present

evidence. Accordingly, we review Shows Urquidi's challenge to the sufficiency of the evidence *de novo*. *United States v. Daniels*, 723 F.3d 562, 569 (5th Cir. 2013) (Defendants "did not need to renew their Rule 29 motions in order to preserve their challenges because they did not present evidence.").

## A.

Shows Urquidi was convicted on Count I for Racketeering Conspiracy pursuant to 18 U.S.C. § 1962(d), which criminalizes conspiring to violate any of the RICO Act's substantive provisions, *i.e.*, subsections (a) through (c) of § 1962. Under the RICO Act's third substantive provision, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" includes state law offenses punishable by imprisonment for more than one year such as murder, kidnapping, and dealing in a controlled substance, and federal offenses involving money laundering and narcotics violations. *Id.* § 1961(1). An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4). A "pattern of racketeering activity" "requires at least two acts of racketeering activity . . . the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *Id.* § 1961(5).

"To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).

"The government is not required to prove a conspiracy through direct evidence. Because conspirators normally attempt to conceal their conduct, the elements of a conspiracy offense may be established solely by circumstantial evidence." *Id.* "The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'" *Id.* (quoting *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)).

> Although a defendant's mere presence at the scene of a crime is not, by itself, sufficient to support a finding that the defendant is participating in a conspiracy, presence and association may be considered by the jury along with other evidence in finding that the defendant participated in a conspiracy.

*Id.* at 857–58. "Moreover, a defendant may be convicted of a conspiracy if the evidence shows that he only participated at one level of the conspiracy charged in the indictment, and only played a minor role in the conspiracy." *Id.* at 858.

Shows Urquidi maintains that the Government failed to prove that he had knowledge of and agreed to the overall objective of the RICO offense. He contends that any illicit activities he committed were for his sole economic benefit and that the Government failed to connect him, either by his activities or affiliations, to the Sinaloa Cartel.

The evidence adduced at trial, though, was more than sufficient to prove his knowledge of and agreement to the Cartel's objectives. Multiple witnesses identified Shows Urquidi as a member of the Sinaloa Cartel. Further testimony described Shows Urquidi frequenting locations as well as parties and meetings where attendance was restricted to Cartel members. During these meetings, Cartel members discussed business strategy and the Cartel's operations. Multiple witnesses also recounted that Shows Urquidi

would help guard tanker trucks full of drugs being transported for the Cartel; take shifts guarding, arranging, and packaging cocaine in Cartel offices; and would observe as cocaine, weapons, and money were loaded onto trucks at Cartel offices for transport. Other testimony established that Shows Urquidi would kidnap, murder, and dispose of bodies for the Cartel as well.

Shows Urquidi's membership and participation in meetings and parties for the Sinaloa Cartel demonstrates that he had knowledge of its objectives. And his support for the Cartel through, *inter alia*, acting as a guard, packaging cocaine, and committing violent acts is sufficient to affirm his § 1962(d) conviction. *See United States v. Velasquez*, 881 F.3d 314, 332 (5th Cir. 2018) (per curiam) (defendants had knowledge of and agreed to the overall objectives of the RICO enterprise where they were members of the enterprise and participated in its meetings and decisions to murder individuals and distribute drugs); *United States v. Nieto*, 721 F.3d 357, 369 (5th Cir. 2013) (membership in RICO enterprise and participation in predicate acts conforming to the enterprise's known enforcement methods were sufficient); *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (sufficient evidence where defendant was a member of the RICO enterprise, attended meetings where drug operations were discussed, and directed and participated in predicate acts). Shows Urquidi's argument that he acted in his own self-interest is unavailing. Even if he acted partly in his own self-interest, there is no doubt that he also provided various forms of support to the Cartel while knowing that his support would further its objectives. *See Salinas v. United States*, 522 U.S. 52, 64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."). That he engaged in this support partly for personal gain is far from unique for a convicted § 1962(d) conspirator.

No. 22-50164

## B.

### 1.

Iglesias-Villegas was convicted on Count IV for Conspiracy to Launder Monetary Instruments pursuant to 18 U.S.C. § 1956(a)(2)(A) and (h). Under § 1956(a)(2)(A), it is unlawful to

> transport[], transmit[], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity.

Section 1956(h) makes it unlawful to conspire to violate § 1956(a)(2)(A). Section 1956(h) consists of two elements: "(i) 'that there was an agreement between two or more persons to commit money laundering'; and (ii) 'that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose.'" *United States v. Alaniz*, 726 F.3d 586, 601 (5th Cir. 2013) (quoting *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006)). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *Fuchs*, 467 F.3d at 906 (quoting *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994)). "An agreement may be inferred from a 'concert of action.'" *Id.* (quoting *Casilla*, 20 F.3d at 603). "Once the government presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy." *United States v. Virgen-Moreno*, 265 F.3d 276, 285 (5th Cir. 2001).

Here, the trial record is not devoid of evidence pointing to Iglesias-Villegas's guilt, nor is his conviction shocking. Iglesias-Villegas was an active member of the Sinaloa Cartel. He was also familiar with its money-laundering operations as shown by his discussions with Agent Briano. Cartel offices were often used to store laundered money, and Iglesias-Villegas was in charge of

No. 22-50164

one of these offices. Furthermore, one witness placed him in a Cartel office being used for this purpose. Accordingly, his conviction on this count was not a manifest miscarriage of justice.

**2.**

Iglesias-Villegas was convicted on Counts VI and VII for violations of the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute, 18 U.S.C. § 1959. He was convicted on Count VII pursuant to 18 U.S.C. § 2 for aiding and abetting as well.[5] Both convictions were for his role in the kidnapping and murder of Sergio Saucedo in the Horizon City Kidnapping.

The VICAR statute states:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . .

18 U.S.C. § 1959(a). To secure a VICAR conviction, five elements must be proven:

> that (1) an enterprise existed; (2) the enterprise engaged in, or its activities affected, interstate commerce; (3) it was engaged in racketeering activity; (4) the defendant committed violent crimes; and (5) the defendant committed the violent crimes to

———————————

[5] The convictions were also pursuant to various provisions of the Texas Penal Code.

23

gain entrance to, or maintain or increase his position in, the enterprise.

*United States v. Perry*, 35 F.4th 293, 320 (5th Cir. 2022) (quoting *United States v. Jones*, 873 F.3d 482, 492 (5th Cir. 2017)). Section 2 states that whoever aids or abets an offense against the United States is punishable as a principal. 18 U.S.C. § 2(a). "[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of the offense, (2) with the intent of facilitating the offense's commission." *United States v. Carbins*, 882 F.3d 557, 563–64 (5th Cir. 2018) (alteration in original) (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)).

For Count VI, Iglesias-Villegas contends that the Government failed to show that he entered into an agreement with the other Cartel members who conspired to murder Saucedo. For Count VII, he similarly asserts that there was no evidence that he either murdered or aided and abetted in the murder of Saucedo. We disagree; the record was not devoid of evidence to support either conviction, *i.e.*, there was no manifest miscarriage of justice. Iglesias-Villegas provided Agent Briano with details concerning the Horizon City Kidnapping, including that he complied with instructions from Marrufo—who coordinated the Horizon City Kidnapping—to drive him to the office where Saucedo was being interrogated and admitted that he assisted in disposing Saucedo's body. While he was being held by the Cartel, Saucedo was kept for multiple days at Iglesias-Villegas's office, where he was interrogated by Marrufo. Further testimony showed that Iglesias-Villegas had arranged for his office to be used for similar interrogations on other occasions and that individuals who were interrogated in Cartel offices were often subsequently executed. Iglesias-Villegas's agreement can be established through hosting Saucedo's interrogation by keeping him at his office, bringing Marrufo to the interrogation, and his general knowledge regarding how the Cartel handled matters akin to the Horizon City

Kidnapping. Iglesias-Villegas knew that it was likely that Saucedo would be murdered after such an interrogation. Iglesias-Villegas's actions here—hosting the interrogation, transporting Marrufo, and burying Saucedo—satisfy aiding and abetting as well.

## VI.

Shows Urquidi contends that the district court erred by failing to *sua sponte* sever his trial from that of Iglesias-Villegas. Because Shows Urquidi raises this issue for the first time on appeal, we review the ruling below for plain error. *See United States v. Vasquez*, 899 F.3d 363, 371–73 (5th Cir. 2018).

"If the joinder of offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM. P. 14(a). Typically, outside of plain error review, "we review the decision not to sever 'under the exceedingly deferential abuse of discretion standard'"; "as a substantive matter, our caselaw does not reflect a 'liberal attitude toward severance.'" *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018) (first quoting *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017); and then quoting *United States v. McRae*, 702 F.3d 806, 822 (5th Cir. 2012)). There is a presumption favoring joint trials "stem[ming] from the belief that '[d]efendants who are indicted together should generally be tried together, particularly in conspiracy cases,' because joint trials 'promote efficiency' and protect against the 'inequity of inconsistent verdicts.'" *Id.* (second alteration in original) (footnote omitted) (first quoting *United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995); and then quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)). "To surmount this heavy presumption, a defendant must show that '(1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice

outweighed the government's interest in economy of judicial administration.'" *Id.* (quoting *United States v. Owens*, 683 F.3d 93, 98 (5th Cir. 2012)).

"To warrant vacatur, the defendant must show 'specific and compelling prejudice' resulting from the joint trial." *Chapman*, 851 F.3d at 379 (quoting *Owens*, 683 F.3d at 100). "[C]ompelling prejudice is not shown if it appears that, through use of cautionary instructions, the jury could reasonably separate the evidence and render impartial verdicts as to each defendant." *United States v. Erwin*, 793 F.2d 656, 665 (5th Cir. 1986). "Merely alleging a 'spillover effect'—whereby the jury imputes the defendant's guilt based on evidence presented against his co-defendants—'is an insufficient predicate for a motion to sever.'" *Chapman*, 851 F.3d at 379 (quoting *United States v. Snarr*, 704 F.3d 368, 397 (5th Cir. 2013)); *see also United States v. Williams*, 809 F.2d 1072, 1085 (5th Cir. 1987) ("The additional evidence adduced at joint trials does not constitute compelling prejudice by itself."). "Nor is it sufficient for a defendant to allege they were less involved than other defendants." *United States v. Perry*, 35 F.4th 293, 343 (5th Cir. 2022). "[I]n conspiracy cases we generally favor specific instructions over severance." *Ledezma-Cepeda*, 894 F.3d at 690; *see also id.* ("[d]efendants who are indicted together should generally be tried together, particularly in conspiracy cases" (alteration in original) (quoting *Musquiz*, 45 F.3d at 931)).

Here, Shows Urquidi argues that most of the evidence adduced at trial was exclusively targeted at the counts that were only faced by Iglesias-Villegas and that this evidence was particularly "graphic, emotional, gruesome, and gut-wrenching." For example, Shows Urquidi points to testimony describing Iglesias-Villegas's work as a sicario and his management of an office of 30 to 35 other sicarios that assisted the Artistas Asesinos, a gang-affiliated group supporting the Sinaloa Cartel, as they

carried out kidnappings and murders. He also cites testimony describing the contents of a videotape depicting men being tortured and murdered that was used by the Sinaloa Cartel to intimidate a rival cartel. And there was testimony concerning the waiter who was tortured and murdered after he was suspected of being responsible for the seizure of about $250,000 of cocaine by U.S. authorities that had belonged to the Cartel. Accompanying this testimony were photographs admitted into evidence showing the head of this man's corpse with a bloody nose and one of his severed fingers placed in his mouth. *See* Part IV *supra*. These are just a few of many examples cited by Shows Urquidi in support of his argument that his joint trial with Iglesias-Villegas was compellingly prejudicial. He asserts that he was not linked to any of the killings or violence recounted in this evidence.

But this is not enough to demonstrate plain error. Here, the purported error is a spillover effect—an insufficient basis for reversal, even if our review was not limited to plain error. *Chapman*, 851 F.3d at 379. The jury instructions also sufficiently cured any spillover risk. As relevant here, the jury instructions read:

> The case of each defendant should be considered separately and individually. The fact that you may find one or both of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime charged. You must give separate consideration to the evidence as to each defendant.

Furthermore, there is no authority requiring *sua sponte* severance on similar facts.

Shows Urquidi also contends that his case is similar to two of our prior decisions where we reversed defendants' convictions because their trials had not been severed from those of their co-defendants. But both of those cases are inapposite. In *United States v. Erwin*, we reversed a defendant's perjury

convictions when the district court denied her motion for severance from a trial where most of the evidence concerned two kidnappings, two beatings, a killing, counterfeiting, and conspiracy and drug charges relating to her co-defendants. 793 F.2d at 656, 665–66. There, we reasoned that the charges brought against the defendant were only "peripherally related" to those that were brought against her co-defendants, and relatedly, "very little of the mountainous evidence was usable against her." *Id.* at 666. Here, though, Defendants were convicted on the same five conspiracy charges, *see Ledezma-Cepeda*, 894 F.3d at 690, requiring many of the same witnesses and evidence. Additionally, the difference between the severity of the crimes under which Defendants were indicted is not as great as it was in *Erwin*.

Nor is our case akin to *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012). In that case, David Warren was tried before a jury for killing Henry Glover while Warren was a rookie officer in the New Orleans Police Department in the aftermath of Hurricane Katrina. *Id.* at 811–17. Warren was convicted of depriving Glover of his right to be free from the use of unreasonable force by a law enforcement officer and carrying, using, and discharging a firearm in furtherance of a crime of violence resulting in an individual's death; the jury also found that the second offense constituted voluntary manslaughter. *Id.* at 817. Warren had been tried alongside four other officers for their roles in covering up Glover's killing; only two of the four officers were convicted. One of the convicted officers, Gregory McRae, was convicted, *inter alia*, of depriving Glover's descendants and survivors of the right to access courts to seek legal redress for a harm, obstruction of a federal investigation, and use of fire to commit a felony in connection with his driving Glover's body into a secluded area, burning Glover's body, and leaving his charred remains to be discovered two weeks later. *Id.* at 817–18. The other officer, Travis McCabe, was convicted of obstruction of a federal investigation by falsifying a police report, making false statements to the FBI

No. 22-50164

concerning the report, and making false statements to the grand jury concerning the report, after the government asserted at trial that he had replaced a police report that was less favorable to Warren with one that justified his shooting Glover. *Id.* at 819.

Warren argued that the district court erred in denying his motions to sever. *Id.* at 822. We agreed, highlighting three forms of prejudice that limiting instructions could not cure:

> (1) the marginal relationship between the charge and the evidence against Warren and that against his co-defendants; (2) the significant difference between the simpleness of the underlying charges—essentially use of excessive force— against Warren, in the performance of his duty as a police officer, and the crimes alleged against his co-defendants involving dishonesty, corruption, obstruction and cover-up; (3) the highly inflammatory and prejudicial nature of the charges and evidence against the co-defendants, from which Warren was disassociated, involving the burning Glover's body . . . , [a] racially motivated beating . . . ; and the alleged alteration and distortion of a police investigative report convince us that the district court abused its discretion.

*Id.* at 828. We also noted that both the nature of the evidence and the government's presentation made it appear as if Warren was part of a conspiracy with his co-defendants to minimize the wrongfulness of his conduct, even though the government did not connect him to the coverup or charge any of the defendants with conspiracy. *Id.* at 826. Here, though, Defendants *were* indicted and convicted on five overlapping conspiracy counts. And relatedly, the differences between the charges and underlying facts faced by Defendants are not as stark as they were in *McRae*.

In our case, the prejudice was not so compelling to overcome the presumption favoring a joint trial as in *Erwin* or *McRae*. In neither case was

reversal solely based on a spillover effect; the charges against the defendants in both cases were markedly dissimilar from those of their respective co-defendants. And notably, the defendants in both cases moved for a severance below. In neither case did we rule that the district court erred in failing to sever the defendant's trial *sua sponte*.

Therefore, the failure to sever *sua sponte* here did not amount to plain error.

## VII.

Shows Urquidi argues that his conviction on Count I, Racketeering Conspiracy, was subject to a fatal variance because his conviction was based on evidence of multiple conspiracies despite the indictment alleging only one underlying conspiracy.

"Fatal variance claims . . . are the right 'not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others.'" *United States v. Gallardo-Trapero*, 185 F.3d 307, 313 (5th Cir. 1999) (quoting *Kotteakos v. United States*, 328 U.S. 750, 775 (1946)). For this reason, a material variance occurs when evidence presented at trial proved multiple conspiracies, while the indictment alleged only a single conspiracy. *United States v. Morris*, 46 F.3d 410, 414 (5th Cir. 1995). "The question of whether the evidence establishes the existence of a single conspiracy or multiple conspiracies is a question of fact for the jury." *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014). "We will affirm the jury's finding that the government proved a single conspiracy 'unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt.'" *United States v. Simpson*, 741 F.3d 539, 548 (5th Cir. 2014) (quoting *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007)). Such a variance only constitutes reversible error if it

prejudices a defendant's substantial rights. *United States v. Richerson*, 833 F.2d 1147, 1154–55 (5th Cir. 1987). Because Shows Urquidi raises this issue for the first time on appeal, he must also satisfy the plain error standard. *See United States v. McCullough*, 631 F.3d 783, 793 (5th Cir. 2011).

"The principal considerations in counting the number of conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *Simpson*, 741 F.3d at 548.

*First*, the Government proved that there was a common goal. "This court has broadly defined the criterion of a common goal in counting conspiracies." *Mitchell*, 484 F.3d at 770. Here, there was ample evidence of Cartel members, including Shows Urquidi, carrying out the Cartel's affairs through a pattern of racketeering activity. That Cartel members also sought personal gain while engaging in Cartel business does not split the conspiracy as Shows Urquidi contends. *See Beacham*, 774 F.3d at 273 ("[I]n [*Richerson*, 833 F.2d at 1153], we concluded that a common goal was shown when alleged co-conspirators all sought 'personal gains' through some participation in a broad conspiracy scheme."); *United States v. Gaytan*, 74 F.3d 545, 552 (5th Cir. 1996) ("The common goal of the conspiracy was financial gain through the importation and distribution of cocaine from El Paso to California."); *Morris*, 46 F.3d at 415 ("The common goal . . . was to derive personal gain from the illicit business of buying and selling cocaine.").

*Second*, the evidence at trial demonstrated that the nature of the Cartel's business supported the existence of a single conspiracy. "[I]n considering the nature of the scheme, a single conspiracy 'will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture.'" *Beacham*, 774 F.3d at 274 (quoting *Mitchell*, 484 F.3d at 770).

Here, the evidence established that different individuals managed the Cartel's day-to-day operations in Juarez and carried out the orders of higher ups; served as the Cartel's enforcement arm and ran its local offices; loaded, unloaded, guarded, and packaged the Cartel's drugs; smuggled the Cartel's drugs into the United States for sale; acquired guns for the Cartel's use; smuggled drug proceeds to Mexico; and stored and counted those drug proceeds. All of the activities listed above were done for the benefit of the Cartel and interdependent. And each of these activities was essential for the Cartel to successfully carry out its operations. *See United States v. Rojas*, 812 F.3d 382, 407 (5th Cir. 2016) ("Here, the plan and the path of travel for all of these deals—transporting cocaine from Colombia to Central America by plane and then to Mexico and ultimately the United States—demonstrate that there was a common scheme.").

*Third*, there was an adequate overlapping of participants throughout the Cartel's operations. "[T]here is no requirement that every member must participate in every transaction to find a single conspiracy." *Beacham*, 774 F.3d at 274 (quoting *Mitchell*, 484 F.3d at 770). "The more interconnected the various relationships are, the more likely there is a single conspiracy." *Id.* (quoting *Mitchell*, 484 F.3d at 770). "A single conspiracy exists where a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal." *Richerson*, 833 F.2d at 1154 (quoting *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982)). In this case, there were two "key men" running the Sinaloa Cartel: El Chapo and El Mayo. They gave their orders to regional bosses, such as German "Paisa" Olivares-Magana and Sergio "El Coma" Garduno-Escobedo in Juarez. The regional bosses then disseminated the orders they received from the Cartel's leaders to lower-ranking Cartel members, including Shows Urquidi. The trial evidence established that the

No. 22-50164

Cartel's hierarchy and membership was consistent enough to satisfy this prong of the analysis.

Shows Urquidi cannot overcome our review for plain error; it is clear to us that his conviction on Count I was based on a single conspiracy.[6]

## VIII.

Shows Urquidi challenges the jury instructions concerning how an "enterprise" was defined for Count I, Racketeering Conspiracy.

Normally we review a challenge to jury instructions for an abuse of discretion. *United States v. Gaspar-Felipe*, 4 F.4th 330, 339 (5th Cir. 2021). But because Shows Urquidi did not raise an objection regarding this instruction below, our review is for plain error. *United States v. Harris*, 104 F.3d 1465, 1471–72 (5th Cir. 1997). "Error in a charge is plain only when, considering the entire charge and evidence presented against the defendant, there is a likelihood of a grave miscarriage of justice." *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001) (quoting *United States v. Sellers*, 926 F.2d 410, 417 (5th Cir. 1991)). An inaccurate instruction "does not amount to plain error 'unless it could have meant the difference between

---

[6] Shows Urquidi also asserts that the district court erred in failing to instruct the jury on multiple conspiracies. This issue is also reviewed for plain error because Shows Urquidi did not raise it below. *See McCullough*, 631 F.3d at 793. "[A] multiple conspiracy instruction 'is generally required where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charge in the indictment.'" *United States v. Greer*, 939 F.2d 1076, 1088 (5th Cir. 1991) (quoting *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989)), *abrogated in part on other grounds*, 968 F.2d 433 (5th Cir. 1992). Here, we have determined that a jury could not reasonably conclude that Shows Urquidi was involved in a separate conspiracy, making such an instruction unnecessary. *See United States v. Devine*, 934 F.2d 1325, 1342 (5th Cir. 1991) ("[W]e have already held that a failure to instruct on multiple conspiracies generally does not constitute plain error.").

acquittal and conviction.'" *Id.* (quoting *United States v. Anderson*, 987 F.2d 251, 256 (5th Cir. 1993)). In reviewing jury instructions, "we examine 'whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them.'" *Gaspar-Felipe*, 4 F.4th at 339 (quoting *United States v. Daniel*, 933 F.3d 370, 379 (5th Cir. 2019)).

A conviction for racketeering conspiracy under the RICO Act requires the existence of an "enterprise," which it defines as "a group of individuals associated in fact." 18 U.S.C. § 1961(4); *id.* § 1962(c). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). A RICO "enterprise" is distinct from a "pattern of racketeering activity" (another element of racketeering conspiracy), which is defined under the RICO Act to include at least two acts of "racketeering activity" (a series of criminal acts also defined under RICO). 18 U.S.C. §§ 1961(5), (1); *id.* § 1962(c); *United States v. Turkette*, 452 U.S. 576, 583 (1981). Each is a necessary element to establish a racketeering conspiracy. Although the Supreme Court has acknowledged that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce,'" it has stressed that "proof of one does not necessarily establish the other." *Boyle*, 556 U.S. at 947 (quoting *Turkette*, 452 U.S. at 583).

Here, the relevant jury instructions read:

Although whether an enterprise existed is a distinct element that must be proved by the government, it is not necessary to find that the enterprise had some function wholly unrelated to the racketeering activity. Common sense dictates that the existence of an enterprise is oftentimes more readily proven by

what it does rather than by an abstract analysis of its structure. Thus, the evidence used to prove the pattern of racketeering and the enterprise may overlap. Therefore, you may consider proof of the racketeering acts to determine whether the evidence establishes the existence of an enterprise, and further, you may infer the existence of an enterprise from evidence of the pattern of racketeering activity.[7]

Shows Urquidi argues that these instructions were erroneous because they did not require the Government to prove that an enterprise existed separately from racketeering activity and conflated the proof required to prove each element. He also contends that the jury was improperly instructed that it could infer the existence of an enterprise from evidence of a pattern of racketeering activity.

Shows Urquidi's arguments are unavailing. The instructions make clear that "whether an enterprise existed is a *distinct* element that must be proved by the government." The disputed language also aligns with the Supreme Court's reasoning in *Turkette* and *Boyle*: it is possible for the same or similar pieces of evidence to be used to prove both elements. *Turkette*, 452 U.S. at 583; *Boyle*, 556 U.S. at 947. The instructions explain that "the evidence used to prove the pattern of racketeering and the enterprise *may* overlap"—coalescence is thus described as a possibility, not an inevitability. Consequently, the instructions do not run afoul of the Supreme Court's guidance as they do not suggest that proof of an enterprise necessarily establishes proof of a pattern of racketeering activity or vice-versa. *Accord United States v. Perholtz*, 842 F.2d 343, 362–64 (D.C. Cir. 1988); *United States v. Pelullo*, 964 F.2d 193, 211–12 (3d Cir. 1992); *Ouwinga v. Benistar 419*

---

[7] These instructions largely track the sample instructions used in KEVIN F. O'MALLEY ET AL., FED. JURY. PRAC. & INSTR. CRIM. COMP. HANDBOOK § 32:5 (June 2022 update).

*Plan Servs., Inc.*, 694 F.3d 783, 793–95 (6th Cir. 2012). These instructions were thus not plainly erroneous.

## IX.

Iglesias-Villegas argues that the $100,000 fine he received was unreasonable.

We review the reasonableness of a fine for an abuse of discretion. *United States v. Pacheco-Alvarado*, 782 F.3d 213, 220 (5th Cir. 2015). Under this standard, "a district court's interpretation or application of the . . . Guidelines is reviewed de novo, and its factual findings . . . are reviewed for clear error." *Id.* (quoting *United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008)). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* (quoting *United States v. Holmes*, 406 F.3d 337, 363 (5th Cir. 2005)).

Here, the PSR calculated a fine range of $25,000 to $10,000,000 as per the Sentencing Guidelines. While the PSR acknowledged Iglesias-Villegas's "indigent status" and that it "appears he may not have the ability to pay a fine" within the Guidelines range, it suggested that the district court "may consider imposing a minimal fine" because he "will have ample opportunity to participate in the Bureau of Prison's Inmate Financial Responsibility Program, which will allow him the opportunity to make monthly payments toward a minimal fine or any other court cost, based on his institutional earnings." The district court adopted the PSR's findings and imposed a $100,000 fine.

Iglesias-Villegas contends that the court abused its discretion because it disregarded the PSR's determination that he was unable to pay a fine and imposed a fine regardless. He asserts that his case is like *United States v. Fair*, 979 F.2d 1037, 1040–42 (5th Cir. 1992), where we reversed the district court's imposition of a fine. There, the district court adopted the PSR's

findings and recommendations; specifically, the PSR recommended against imposing a fine because the defendant had no assets that could be liquidated, and it did not appear that he would "have the means to pay a fine on an installment basis after a lengthy period of incarceration." *Id.* at 1040. The *Fair* Court rejected the fine imposed by the district court because "specific findings are necessary if the court adopts a PSR's findings, but then decides to depart from the PSR's recommendation on fines or cost of incarceration." *Id.* at 1041. In *Fair*, the district court failed to provide its own findings—separate from those of the PSR—when it chose to depart from the PSR's recommendation. *See id.* at 1042. In our case, though, the PSR found that Iglesias-Villegas *could* contribute to a court-imposed fine through his prison earnings. The record thus supports the district court's finding that Iglesias-Villegas can pay a fine. This finding was therefore not clearly erroneous, and the district court did not abuse its discretion.

## X.

The parties agree that the sentences imposed for both Defendants' convictions on Counts IV and V and for Iglesias-Villegas's convictions on Counts VI, VIII, and X exceed their respective statutory maxima and should be corrected.

"[W]e review de novo a sentence that allegedly exceeds the statutory maximum term." *United States v. Ferguson*, 369 F.3d 847, 849 (5th Cir. 2004) (per curiam).

The maximum term of imprisonment that may be imposed for either Count IV—Conspiracy to Launder Monetary Instruments or Count V—Conspiracy to Possess Firearms in Furtherance of any Crime of Violence or Drug Trafficking Crime is 20 years. 18 U.S.C. §§ 1956(a)(2), 924o. The maximum term of imprisonment that may be imposed for Counts VI, VIII, or X—all VICAR convictions—is 10 years. *Id.* § 1959(a)(5). Nevertheless, both

No. 22-50164

Defendants were sentenced to concurrent life terms of imprisonment on Counts IV and V, and Iglesias-Villegas also received concurrent life sentences for Counts VI, VIII, and X. These sentences all exceed their respective statutory maxima. Therefore, the life sentences imposed for Counts IV, V, VI, VIII, and X are vacated, and the case is remanded for resentencing on those counts only.[8]

## XI.

Defendants' convictions are AFFIRMED. We VACATE the sentences of Shows Urquidi for Counts IV and V and Iglesias-Villegas for Counts IV, V, VI, VIII, and X and REMAND to the district court for resentencing that is consistent with the reasoning in Part X of this opinion.

---

[8] The Government argues that we need not remand these counts for resentencing, and we may instead reform the sentence on each count according to its respective statutory maximum. *See* 28 U.S.C. § 2106. We decline to do so because "[t]he imposition of life sentences for [these counts] comports with the district court's oral pronouncement of the sentences and are not mere 'clerical errors' subject to reformation . . . ." *United States v. Velasquez*, 710 F. App'x 189, 192 (5th Cir. 2017) (per curiam).