# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2024

Lyle W. Cayce
Clerk

No. 22-40619

———————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Jesse Paul Blankenship; William Glenn Chunn,

*Defendants—Appellants*.

———————————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:20-CR-83-5

———————————————————————————

Before Jones, Barksdale, and Elrod, *Circuit Judges*.

Per Curiam:[*]

Primarily at issue are whether the district court: abused its discretion in denying Jesse Paul Blankenship and William Glenn Chunn's continuance motions; and erred in sentencing each to life imprisonment. They were

———————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

among 12 persons charged in an original four-count indictment, for which there is a superseding indictment. Blankenship and Chunn were charged for racketeering conspiracy, with Blankenship's being also charged for (1) violent crimes in aid of racketeering (VICAR)-kidnapping, and (2) conspiring to commit such kidnapping. In their consolidated 14-day trial with more than 30 witnesses, a jury found them guilty of all charges. AFFIRMED.

I.

Blankenship and Chunn were members of the "Aryan Circle" (AC), a "whites only" prison-based gang. Chunn served as vice president of AC's "federal system" and as a member of its "task force"—a confidential and select group of members "capable of certain acts of violence" that served as AC's "hit squad". Blankenship served as an AC "major", exercising authority over AC members in the Missouri Department of Corrections and AC's federal-prisons branch.

AC generally operated according to a "constitution". To join, a "prospect" was required to, *inter alia*, "put in work" by committing violence at the direction of an AC member. Full members earned the right to wear the AC "patch"—generally a tattoo of a diamond with a swastika on the inside containing a circle with lightning bolts or "AC". Prospects were also required to undergo a background check, by which AC obtained and reviewed the prospect's "paperwork"—usually court documents, presentence investigation reports, or criminal-history checks—to ensure he had not previously cooperated with law enforcement or engaged in other conduct prohibited by AC. AC did not limit its membership to prisoners.

Following the 14-day jury trial, Blankenship and Chunn were each convicted of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). Blankenship was also convicted of: violent crimes in aid of racketeering (VICAR)-kidnapping, in violation of 18 U.S.C.

§ 1959(a)(1); and conspiracy to commit VICAR-kidnapping, in violation of 18 U.S.C. § 1959(a)(5). The court in 2022 sentenced each to life imprisonment.

## II.

Blankenship challenges venue. Appellants challenge the denial of their continuance motions, the sufficiency of evidence, and numerous sentencing rulings.

## A.

Blankenship contends the evidence was insufficient to establish venue in the Eastern District of Texas for his two VICAR offenses. Because he did not preserve this issue in district court, review is only for plain error. *E.g.*, *United States v. Broussard*, 669 F.3d 537, 546 (5th Cir. 2012). Under that standard, he must show a forfeited plain error (clear-or-obvious error, rather than one subject to reasonable dispute) that affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he makes that showing, we have the discretion to correct the reversible plain error, but generally should do so only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Id.* (citation omitted).

Blankenship has not shown the claimed venue error affected his substantial rights. "As a general rule, an error affects a defendant's substantial rights only if the error was prejudicial." *United States v. Reed*, 974 F.3d 560, 562 (5th Cir. 2020) (citation omitted). Specifically, "defendant must show a reasonable probability that the result of the proceedings would have been different but for the error". *Id.* at 562–63 (citation omitted). Blankenship does not contend he suffered the requisite prejudice, only that venue was erroneous.

No. 22-40619

B.

Regarding Appellants' challenges to the denial of their September 2021 continuance motions, they were indicted originally in October 2020 and trial was set for February 2021. After four unopposed continuance motions were granted, trial was reset for that August. In early July, Chunn's opposed continuance motion was granted, resetting trial for October 2021, a year after their initial indictment. That September, Appellants filed the opposed continuance motions at issue.

Their challenges to the denial of these motions are reviewed for abuse of discretion. *E.g.*, *United States v. Capistrano*, 74 F.4th 756, 777 (5th Cir.), *cert. denied*, No. 23-5975, 2023 WL 8532046 (U.S. 11 Dec. 2023). The court's discretion in ruling on continuance motions is understandably broad. *E.g.*, *United States v. Mesquiti*, 854 F.3d 267, 275 (5th Cir. 2017). To show such abuse, Appellants "must show that the denial resulted in specific and compelling or serious prejudice". *Id.* (citation omitted). For our review, we "look[] to the totality of the circumstances", including: (1) "the amount of time available"; (2) "defendant's role in shortening the time needed"; (3) "the likelihood of prejudice from denial"; (4) "the availability of discovery from the prosecution"; (5) "the complexity of the case"; (6) "the adequacy of the defense actually provided at trial"; and (7) "the experience of the attorney with the accused". *United States v. Stalnaker*, 571 F.3d 428, 439 (5th Cir. 2009) (citation omitted).

1.

Appellants have not shown "specific and compelling or serious prejudice" in the denial of a sixth motion to continue. *Mesquiti*, 854 F.3d at 275 (citation omitted). Blankenship asserts he was prejudiced because he presented no witnesses at trial and counsel proceeded to trial without reviewing all discovery. Chunn contends he had insufficient time to review

discovery or prepare a defense with his attorney, and could not have properly made a decision to testify with such insufficient time. Neither Appellant, however, identifies any evidence he would have presented, witnesses he would have called, or specific defensive strategies he would have employed if given more time. *See id.* at 275–76 (requiring specifics in contentions of prejudice); *Capistrano*, 74 F.4th at 777 (same).

2.

Instead, Appellants claim other prejudice related to the denial of their continuance motions. Blankenship contends the claimed error in denying his motion was compounded when the court erroneously allowed an unlisted Government witness to testify. Chunn maintains: the court reversibly erred in not granting his alternative discovery motion after denying his continuance motion; and the denial of those motions had the cumulative effect of violating his Fifth and Sixth Amendment rights.

a.

Regarding Blankenship's contention that the harm in denying his continuance motion was exacerbated when the court admitted testimony by a Government witness not included on the Government's witness list, a "district court's order instructing the government to provide a list of witnesses is a discovery order". *United States v. Aguilar*, 503 F.3d 431, 434 (5th Cir. 2007). Our court "review[s] the admission of evidence that violates a discovery order", as here, "for abuse of discretion". *Id.*

The Supreme Court has explained there is no general constitutional right to pretrial discovery of witnesses in non-capital cases. *E.g.*, *Weatherford v. Bursey*, 429 U.S. 545, 559–60 (1977). "The district court has great latitude in fashioning the appropriate remedy for alleged discovery errors." *United States v. Dvorin*, 817 F.3d 438, 454 (5th Cir. 2016) (citation omitted). Our

court "will order a new trial only where a defendant demonstrates prejudice to his substantial rights". *Aguilar*, 503 F.3d at 434 (citation omitted).

The court did not abuse its discretion. When determining whether to sanction a party for violating a discovery order, the court "should consider the following factors: (1) the reasons why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances". *Dvorin*, 817 F.3d at 454 (citation omitted). First, the disclosure was not made because the Government decided to call the witness only when a gap—the result of a severance and a codefendant's plea— occurred in the trial schedule. Second, any prejudice to Blankenship was minimal. The Government announced on a Friday its intention to call the witness the following Monday, allowing defense counsel the weekend to prepare. *See id.* (upholding admittance of testimony when Government identified witness on morning of testimony). Additionally, the witness testified about an incident disclosed during discovery. Third, Blankenship does not assert the untimely disclosure of the witness was in bad faith. *See id.* (noting no claim late disclosure was in bad faith); *United States v. Garrett*, 238 F.3d 293, 295 (5th Cir. 2000) (vacating district court's exclusion of late- noticed Government witnesses where that court found no bad faith).

Neither has Blankenship demonstrated prejudice to his substantial rights. *See, e.g.*, *Aguilar*, 503 F.3d at 434. He has not shown "there was any way in which []he would have been better prepared to subject [the witness'] testimony to adversarial testing if his name had been disclosed on a witness list". *Id.* In fact, counsel extensively cross-examined the witness; and, as noted, the incident addressed by the witness had been disclosed in discovery. *See id.* (finding no prejudice).

b.

Regarding Chunn's two claims for other prejudice, we first turn to the denial of his discovery motion.

i.

In response to the denial of his continuance motion, Chunn filed a discovery motion requesting access within his prison facility to a computer containing discovery materials. Chunn asserts the court reversibly erred in denying that motion.

Early in the proceedings, the court entered an *agreed* protective order stating discovery would "not be provided to defendant as originals or duplicated, or otherwise disseminated, without further order of th[e] Court". The order further explained defendants would be "allowed to access and review these materials; however, [they would] not be allowed to possess the originals or a copy of these documents outside of the courtroom and/or in the presence of defense counsel, absent prior permission from th[e] Court". One month before trial, Chunn filed his motion, essentially asking the court to revise the protective order.

The court had compelling reasons for imposing the protective limits on discovery. The Government asserted Chunn was actively attempting to obtain discovery to disseminate it for retaliatory purposes. It pointed to an instance in which one of its witnesses received a letter from an AC communications hub that the witness believed to be a threat.

"We review the district court's denial of a motion to modify a criminal protective order for abuse of discretion." *United States v. Morales*, 807 F.3d 717, 720 (5th Cir. 2015). "There is no general constitutional right to discovery in a criminal case". *Weatherford*, 429 U.S. at 559. "[T]he trial court can and should, where appropriate, place a defendant and his counsel

under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect". *Alderman v. United States*, 394 U.S. 165, 185 (1969). Under Federal Rule of Criminal Procedure 16, the court "may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief". Fed. R. Crim. P. 16(d)(1).

In deciding whether to modify a protective order, courts consider: (1) "the nature of the protective order"; (2) "the foreseeability, at the time of issuance of the order, of the modification requested"; (3) "the parties' reliance on the order; and most significantly (4) whether good cause exists for the modification". *Morales*, 807 F.3d at 723 (citation omitted). "Good cause is the most important of these factors in the criminal context, given that phrase's inclusion in Rule 16(d)(1)." *Id.*

Both the second and fourth factors weigh against modification. On the second factor, Chunn sought to change only how he was permitted to view the discovery material. The alleged need to view the material outside the presence of counsel to aid in preparation would have been foreseeable at the time of the agreed protective order's issuance. For the fourth factor, Chunn has not shown good cause. In this context, "good cause" includes "changed circumstances or new situations" and it "factors in the other party's need for protection". *Id.* at 723–24 (citation omitted). Again, Chunn points to no legitimate changed circumstances and, even if he could, the Government's need for protection was legitimate. There was no abuse of discretion. *See id.* at 720 (outlining standard of review).

ii.

Chunn asserts the ultimate effect of the denial of his continuance motion was to violate his Fifth Amendment right to due process and Sixth Amendment right to assistance of counsel. "[O]nly an arbitrary or unreasonable denial of a requested continuance will constitute a violation of

the defendant's Fifth or Sixth Amendment rights". *United States v. Hughey*, 147 F.3d 423, 431 (5th Cir. 1998). As discussed, the district court did not abuse its discretion in denying Chunn's motion, and neither was the denial "arbitrary or unreasonable". *Id.*

## C.

Appellants contend the evidence was not sufficient to support their convictions. Our court reviews timely sufficiency challenges *de novo*, construing the evidence in the light most favorable to the verdict. *E.g.*, *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020). "The jury's verdict will be affirmed unless no rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015) (citation omitted). That standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts". *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (citation omitted). Our court "resolve[s] any conflict in the evidence in favor of" the verdict. *Sanders*, 952 F.3d at 273. Additionally, "we defer to the credibility determinations of the jury, and we reject the challenges to the sufficiency of the evidence based solely upon such credibility determinations". *United States v. Perry*, 35 F.4th 293, 317 (5th Cir.), *cert. denied*, 143 S. Ct. 463 (2022).

The Government presented its case-in-chief through more than 30 witnesses and approximately 450 exhibits over the course of the 14-day trial. Following the Government's case-in-chief, Appellants rested without presenting any evidence.

1.

Blankenship does not contest the sufficiency of evidence for his conviction for conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d).  He does contest sufficiency for his convictions for VICAR-kidnapping and conspiracy to commit VICAR-kidnapping, in violation of 18 U.S.C. § 1959(a)(1), (5).

To convict Blankenship of his VICAR offenses, the Government was required to prove beyond a reasonable doubt, *inter alia*: "(1) an enterprise existed; (2) the enterprise engaged in, or its activities affected, interstate commerce; (3) it was engaged in racketeering activity; (4) the defendant committed violent crimes; and (5) the defendant committed the violent crimes to gain entrance to, or maintain or increase his position in, the enterprise".  *United States v. Shows Urquidi*, 71 F.4th 357, 377 (5th Cir.) (citation omitted), *cert. denied sub nom. Iglesias-Villegas v. United States*, 144 S. Ct. 268 (2023); *see also* 18 U.S.C. § 1959(a).  Blankenship contests only elements four and five.

a.

For VICAR element four's requisite violent crime, the Government charged Blankenship with kidnapping a former AC member (FAC), in violation of Missouri state law.  A person violates that kidnapping statute when he, *inter alia*, "removes another person without his or her consent from the place where he or she is found".  Mo. Rev. Stat. § 565.110.

Blankenship asserts there is insufficient evidence he removed FAC without his consent from his girlfriend's house.  He contends FAC left the house willingly.  Testimony established that, after Blankenship and another man entered the house unannounced and without knocking, Blankenship explained to FAC's girlfriend that he would take FAC with them, and it appeared to FAC's girlfriend that FAC had no choice but to leave with the

pair. FAC testified: he was not willing to go with the group; thought he would be "beat up or something" if he did not leave with them; believed leaving with the group was a life-or-death choice; and was confined to a vehicle with Blankenship, who held a gun on his lap.

FAC testified on cross-examination, however, that, before leaving with Blankenship, he stated: "Hell, yeah. Let's go. Okay. I'm ready". He also testified on cross that he left the house willingly.

Resolving "conflict[s] in the evidence in favor of" the verdict and recognizing the jury "retains the sole authority to weigh conflicting evidence and evaluate the credibility of the witnesses", the evidence was sufficient to show Blankenship removed FAC from the house without his consent. *Sanders*, 952 F.3d at 273; *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005) (citation omitted).

b.

For VICAR element five's above-described requisite reason for committing a violent crime, Blankenship contends the evidence did not establish the kidnapping was committed for the purpose of maintaining or increasing his position within AC.

Blankenship asserts the kidnapping occurred because of a personal issue between FAC and another AC member, not as a matter of AC punishment. Evidence, however, supports the contrary conclusion: Blankenship kidnapped FAC because he did not provide his "paperwork" proving he was not cooperating with a Government investigation. Also, Blankenship explained in emails that he completed the kidnapping for the benefit of AC and in hopes of earning membership on its "task force". Viewing the evidence in the requisite light most favorable to the verdict, a jury could have reasonably concluded the kidnapping was done for the

purpose of maintaining or increasing Blankenship's position within AC. *See Shows Urquidi*, 71 F.4th at 377 (listing element five).

2.

Chunn contends the evidence was insufficient to support his sole conviction: conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). To establish a racketeering-conspiracy violation under 18 U.S.C. § 1962(c), the Government must prove beyond a reasonable doubt: "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was 'employed by' or 'associated with' the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through 'a pattern of racketeering activity'". *United States v. Posada-Rios*, 158 F.3d 832, 855 (5th Cir. 1998) (quoting 18 U.S.C. § 1962(c)).

Chunn contests elements one and three. He also contends the evidence was insufficient because the trial testimony was primarily by former AC members seeking sentence reductions.

a.

For element one, Chunn asserts AC is neither sufficiently cohesive nor organized to be an "enterprise". 18 U.S.C. § 1962(c). An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity". 18 U.S.C. § 1961(4). This definition "reaches a group of persons associated together for a common purpose of engaging in a course of conduct" and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit". *Boyle v. United States*, 556 U.S. 938, 944–45 (2009) (citation omitted). "A jury may infer the existence of a RICO enterprise by considering largely

or wholly circumstantial evidence." *United States v. Velasquez*, 881 F.3d 314, 329 (5th Cir. 2018).

AC's "constitution" outlined the history, purpose, "ethics", beliefs, and bylaws of AC. The document included a description of AC's rigid ranking system, a system witnesses repeatedly referenced and affirmed. To join AC, prospective members underwent a period of "prospecting" outlined in the "constitution", typically lasting one year. The process involved learning about AC, handwriting copies of its "constitution", and following every order. In addition to monthly dues, AC required members attend district meetings once a month and ranking members attend a national meeting annually. AC also tracked members through rosters identifying members' names, institutional affiliations, patch numbers, and release dates. Substantial evidence supports the finding that AC was an ongoing, formal organization, and its associates functioned as a continuing unit. *See Boyle*, 556 U.S. at 944–45.

b.

For element three, Chunn disputes his involvement in AC's affairs. "[T]o have participated in the conduct of the enterprise's affairs, the defendant must have participated in the operation or management of the enterprise itself". *Velasquez*, 881 F.3d at 330 (citation omitted). "An enterprise can be operated by upper management and by lower rung participants under the direction of upper management." *Id.* Chunn held a high rank in AC; made decisions about when to go to "war" with other prison gangs; ordered attacks on a Zerbinos gang member, an AC member, an Aryan Brotherhood member, and a homosexual inmate; and sold drugs in prison. There was substantial evidence Chunn participated in, at least, the operation of AC. *See id.* (explaining element three is met when defendant participated in enterprise's operation or management).

No. 22-40619

c.

Likewise, Chunn fails to establish his conviction lacked sufficient evidence by asserting many witnesses were former AC members cooperating with the Government. "This Court has long held that a defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain, so long as the coconspirator's testimony is not 'incredible.'" *Perry*, 35 F.4th at 317 (citation omitted). "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *Id.* (citation omitted). Therefore, our court has "allowed convictions supported only by one witness' testimony to stand, [w]hatever the problems with that witness' credibility, if the account was neither physically impossible nor outside his powers of observation". *Id.* (alteration in original) (citation omitted).

Chunn has not pointed to any trial testimony that was physically impossible or outside the power of a witness' observation. And, as discussed *supra*, our court will reject sufficiency challenges based only on credibility determinations. *Id.*

D.

Appellants' numerous remaining challenges are to their sentences. Although post-*Booker*, the Sentencing Guidelines are advisory only, the district court must avoid significant procedural error, such as improperly calculating the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). If no such procedural error exists, a properly preserved objection to an ultimate sentence is reviewed for substantive reasonableness under an abuse-of-discretion standard. *Id.* at 51; *United States v. Delgado-Martinez*, 564 F.3d 750, 751–53 (5th Cir. 2009). In that respect, for issues preserved in district court, its application of the Guidelines is reviewed *de*

*novo*; its factual findings, only for clear error. *E.g.*, *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).

"A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *United States v. Zuniga*, 720 F.3d 587, 590 (5th Cir. 2013). Re-stated, our court will find clear error in a factual finding "only if a review of the record results in a definite and firm conviction that a mistake has been committed". *Id.* (citation omitted). "When making factual findings for sentencing purposes, district courts may consider any information which bears sufficient indicia of reliability to support its probable accuracy". *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (citation omitted). "Generally, a [presentence investigation report (PSR)] bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations." *Id.* (citation omitted). The PSR does not convert bald, conclusory statements into sufficiently reliable facts. *See id.* at 230 n.2. If the PSR's facts "are supported by an adequate evidentiary basis with sufficient indicia of reliability", however, "a defendant must offer rebuttal evidence demonstrating that those facts are materially untrue, inaccurate or unreliable". *Id.* at 230 (citation omitted). Appellants presented no evidence at sentencing disputing the PSR's factual allegations.

For the Guidelines' offense-level and criminal-history matrix, which determines the Guidelines sentencing range, the primarily contested item by each Appellant is his offense level. Along that line, Guideline § 1B1.1 outlines the application of the Guidelines.

To calculate a Guidelines sentence, a court begins by first determining the Chapter Two Guidelines section applicable to the offense based on the Guidelines' Statutory Index. Guideline § 1B1.1(a)(1). The Statutory Index identifies Section 2E1.1 ("Unlawful Conduct Relating to Racketeer

Influenced and Corrupt Organizations") as the section applicable to violations of 18 U.S.C. §§ 1962, 1963. Guideline app. A.

Second, the court must "[d]etermine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions". *Id.* § 1B1.1(a)(2). Section 2E1.1 applies a base offense level of 19, or "the offense level applicable to the underlying racketeering activity". *Id.* § 2E1.1(a). In determining the base offense level, the court is to consider all relevant conduct. *Id.* § 1B1.3(a). Relevant conduct includes: "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"; and, in joint-criminal activity, "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity". *Id.* The relevant conduct does not need to be charged or an element of the offense. *Id.* § 1B1.3 cmt. background. In racketeering cases, however, the relevant conduct must qualify as "racketeering activity". *See id.* § 2E1.1(a)(2); *United States v. Flores*, 912 F.3d 613, 621–23 (D.C. Cir. 2019); *see also* 18 U.S.C. § 1961(1) (defining "racketeering activity").

Third, the court must "[a]pply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three". Guideline § 1B1.1(a)(3). The court repeats these first three steps for each count when there are separate counts of a conviction. *Id.* § 1B1.1(a)(4). For racketeering cases where, as here, "there is more than one underlying offense", the court must "treat each underlying offense as if contained in a separate count of conviction". *Id.* § 2E1.1 cmt. n.1. The court will determine the offense level applicable to each underlying offense and combine the points according to Guideline § 3D1.4. *Id.* § 3D1.1(a); *see also id.* § 3D1.4(a).

No. 22-40619

Finally, the court applies any adjustment for acceptance of responsibility, determines defendant's criminal-history category, and calculates the resulting Guidelines sentencing range. *Id.* § 1B1.1(a)(5)–(8).

1.

Blankenship claims eight procedural errors. As discussed *supra*, "[w]here there is more than one underlying offense", the court must "treat each underlying offense as if contained in a separate count of conviction". *Id.* § 2E1.1 cmt. n.1. The PSR identified four offenses underlying Blankenship's conviction for conspiracy to participate in a racketeering enterprise: 2016 kidnapping of FAC (Count 1A); 2016 attempted murder of FAC (Count 1B); 2016 drug-trafficking conduct (Count 1C); and 2020 attempted murder of a rival gang-member (Count 1D). The district court calculated the offense level for each underlying offense and combined the units. *See id.* § 3D1.1(a) (outlining calculation process).

Blankenship contends the court reversibly erred in: applying a two-level "serious bodily injury" enhancement and two-level dangerous-weapon enhancement to Count 1A; applying the wrong base offense level to Count 1B; incorporating an unproved drug quantity, and including his 2016 drug-trafficking conduct as both underlying racketeering activity and criminal history in Count 1C; employing the wrong burden of proof in finding Count 1D to be an underlying offense, and applying the incorrect base offense level to that count; and applying a four-level organizer/leader enhancement.

All of Blankenship's contentions, except for the two concerning Count 1D, are reviewed for clear error. *See Zuniga*, 720 F.3d at 590 (finding clear error "only if a review of the record results in a definite and firm conviction that a mistake has been committed" (citation omitted)). For the first of the two exceptions, his claim that the court evaluated Count 1D under the incorrect Guideline section is reviewed *de novo*. *E.g.*, *Cisneros-Gutierrez*,

517 F.3d at 764 (explaining application of Guidelines is reviewed *de novo*). Regarding the second exception, because he did not preserve the issue in district court, his challenge to the offense level of Count 1D is subject to plain-error review. *See Puckett*, 556 U.S. at 135 (outlining plain-error standard).

a.

For the underlying racketeering activity of Count 1A—kidnapping FAC in 2016—the offense level began at 32 according to Guideline § 2A4.1(a). The court increased the offense level by four points because it found FAC suffered "serious bodily injury" and "a dangerous weapon was used". *See* Guideline § 2A4.1(b)(2)(B), (b)(3). Blankenship challenges both enhancements.

i.

The court applied a two-level enhancement because it found FAC sustained "serious bodily injury" during removal of his patch. *See id.* § 2A4.1(b)(2)(B) ("[I]f the victim sustained serious bodily injury, increase by 2 levels".). Blankenship contends FAC sustained only "bodily", not "serious bodily", injury. The Guidelines' commentary defines "[s]erious bodily injury" as, *inter alia*, an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation". *Id.* § 1B1.1 cmt. n.1(M). By comparison, the commentary defines the lesser "[b]odily injury" as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought". *Id.* § 1B1.1 cmt. n.1(B). Therefore, at issue is whether FAC suffered an "injury involving extreme physical pain". *Id.* § 1B1.1 cmt. n.1(M) (defining "[s]erious bodily injury").

After removing him from his girlfriend's house, FAC's kidnappers drove him to an AC-member's home and directed him to the basement where several members were heating a metal rod with a blow torch. The AC members allowed FAC to smoke from marihuana and meth pipes before twice placing the heated rod against his torso in an attempt to remove his AC patch. Afterward, Blankenship tattooed over FAC's patch and explained that, if it were up to him, he would have just killed him.

FAC testified at trial that Blankenship and the other AC members "took it easy" on him and told him he "took that like a G[angster]". He did not seek medical aid.

Blankenship asserts: FAC never testified that he suffered extreme physical pain; and the enhancement requires the victim subjectively experience such pain. The Government counters the court could infer FAC experienced extreme physical pain based on the testimony and circumstances of the tattoo-removal.

Although FAC did not testify he felt the requisite "extreme physical pain" during the patch removal, our court has never held a victim's testimony is the exclusive means of proving such pain. Rather, the district court is permitted to reasonably infer such pain from the evidence. *See United States v. Garza-Robles*, 627 F.3d 161, 169–70 (5th Cir. 2010) ("The [PSR] indicates that [the victim] had been assaulted repeatedly resulting in a broken rib, bruised buttocks, and cuts behind the ears. It was plausible for the district court to find these injuries involved 'extreme pain' and therefore qualified as serious bodily injuries."); *United States v. Davis*, 19 F.3d 166, 168–69, 171 (5th Cir. 1994) (finding no clear error where district court, without reference to victim's testimony, found "serious bodily injury" when victim was bound, beaten, poked, gagged, and confined to vehicle trunk as defendants drove across state lines); *see also United States v. Shi Yong Wei*,

373 F. App'x 121, 123 (2d Cir. 2010) ("Where a victim has been beaten bloody and unconscious, requiring emergency hospitalization (even briefly) and stitches, *any reasonable person* would conclude that the injury caused 'extreme physical pain.'" (emphasis added)).  Therefore, the court did not clearly err in finding FAC suffered "serious bodily injury" when evidence showed AC members restrained him, twice placed a heated metal rod on his AC tattoo, and then tattooed over it. *See Zuniga*, 720 F.3d at 590 ("A factual finding is not clearly erroneous if it is plausible in light of the record as a whole.").

ii.

The two-level dangerous-weapon enhancement is applicable "[i]f a dangerous weapon was used" during a kidnapping.  Guideline § 2A4.1(b)(3).  A "dangerous weapon was used" if the firearm was "discharged" or "otherwise used".  *Id.* § 2A4.1 cmt. n.2.  Because there was no evidence Blankenship "discharged" his firearm, the enhancement applies only if he "otherwise used" it. *See id.*

A firearm is "[o]therwise used" if "the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon".  *Id.* § 1B1.1 cmt. n.1(J).  The Guidelines define "[b]randished" as "all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person".  *Id.* § 1B1.1 cmt. n.1(C).

Therefore, at issue is whether Blankenship "more than brandish[ed], display[ed], or possess[ed] a firearm" while kidnapping FAC.  *Id.* § 1B1.1 cmt. n.1(J).  Our court has explained:

> The threat to the victim must be specific rather than general. Displaying a weapon without pointing or targeting should be classified as "brandished," but pointing the weapon at any individual or group of individuals in a specific manner should be "otherwise used."

*United States v. Dunigan*, 555 F.3d 501, 505 (5th Cir. 2009) (citation omitted); *see also United States v. Sanchez*, 603 F. App'x 259, 263–64 (5th Cir. 2015) (rejecting Government's request to expand definition of "otherwise used" "to activity beyond . . . a direct physical threat caused by pointing or otherwise targeting the weapon at the victims").

There is no evidence Blankenship displayed a firearm as he entered FAC's home; there is evidence he placed one on his lap as the AC members drove FAC to the patch-removal location. As they drove, FAC requested the group drop him off at a tattoo shop so he could cover his patch there. The AC members refused.

And, there is no evidence Blankenship pointed the gun at FAC; but, its placement on Blankenship's lap, in full view of FAC, and in a vehicle containing only two other AC members, all while preventing him from leaving the vehicle, could be threatening only to FAC. The threat to him was therefore "specific" and "target[ed]" him. *Dunigan*, 555 F.3d at 505. The court did not clearly err.

b.

For the underlying racketeering activity of Count 1B—attempted murder of FAC in 2016—the court applied a base offense level of 33. Guideline § 2A1.5(c)(2) ("If the offense resulted in an attempted murder or assault with intent to commit murder, apply §2A2.1".); *id.* § 2A2.1(a)(1) (applying base level of 33 "if the object of the offense would have constituted

first degree murder"). Blankenship contends the court applied the incorrect base offense level.

The incident occurred several weeks after FAC's patch removal. In the middle of the night, Blankenship donned a mask and, with two other AC members, entered FAC's house. They kicked down the bedroom door and found FAC in bed asleep with his girlfriend. Blankenship fired one shot at FAC, striking the bedframe, before retreating from the house.

Blankenship contends that, even if he did shoot at FAC, he at most committed aggravated assault, not attempted murder. *See id.* § 2A2.2 cmt. n.1 (defining "[a]ggravated assault" as, *inter alia*, "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury . . . with that weapon"). It was plausible in the light of the record as a whole for the court to find that, when Blankenship broke into FAC's house and shot at him as he slept, the object of the attack was first-degree murder. The court did not clearly err.

c.

Blankenship likewise challenges the 2016 drug-trafficking conduct (Count 1C) the PSR included as underlying racketeering activity in his offense-level computation. He asserts the court reversibly erred by: sentencing based on an unproved drug quantity; and including the drug-trafficking conduct as both underlying racketeering activity and criminal history, in violation of the Double Jeopardy Clause.

i.

The PSR recommended the court find Blankenship responsible for 535.714 grams of methamphetamine. The calculated quantity was based on case material provided by the Government that police apprehended Blankenship's vehicle containing $30,000 in proceeds from

methamphetamine sales.  The PSR applied the 2017 price for 93-percent, pure methamphetamine and reached the approximate 535.714 grams.  The court therefore applied Guideline § 2D1.1(c)(5) (explaining base offense level is 30 for offenses involving at least 500 grams but less than 1.5 kilograms of methamphetamine).  Blankenship contends the Government did not meet its burden of establishing the relevant drug quantity by the requisite preponderance of the evidence.

"[A] district court may consider estimates of the quantity of drugs for sentencing purposes."  *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005) (alteration in original) (citation omitted).  In making its fact finding, the court "may consider any information that has sufficient indicia of reliability to support its probable accuracy, including a probation officer's testimony, a policeman's approximation of unrecovered drugs, and even hearsay".  *Id.* at 247 (citation omitted).

There was trial evidence in addition to the $30,000 discussed by the case material.  A witness testified she observed Blankenship paying the witness' methamphetamine dealer a substantial amount of money and, based on her observation, Blankenship was dealing more than a pound of methamphetamine at a time.  Another witness likewise testified Blankenship was dealing large quantities of methamphetamine.  The court also found that, even if Blankenship did not directly engage in drug trafficking, he was responsible for the amount based on trafficking of other members of the conspiracy.  *See United States v. Fierro*, 38 F.3d 761, 773 (5th Cir. 1994) (observing district court may consider any reasonably foreseeable amounts part of common plan or scheme); *United States v. Castillo*, 732 F. App'x 267, 268 (5th Cir. 2018) ("[Defendant] could be held accountable for all drug quantities involved in the conspiracy".).

No. 22-40619

Additionally, a "[PSR] generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations required by the sentencing guidelines". *United States v. Alford*, 142 F.3d 825, 831–32 (5th Cir. 1998) (citation omitted).  Again, when, as here, the PSR's factual allegations "are supported by an adequate evidentiary basis with sufficient indicia of reliability, a defendant must offer rebuttal evidence demonstrating that those facts are materially untrue, inaccurate or unreliable".  *Harris*, 702 F.3d at 230 (citation omitted).  Blankenship presented no rebuttal evidence.  There was no clear error.

ii.

In contesting, on double-jeopardy grounds, the inclusion of this 2016 drug-trafficking conduct, Blankenship notes his PSR's criminal-history section includes a 2018 conviction for, *inter alia*, possession with intent to distribute methamphetamine.  Accordingly, he contests the PSR's listing the conviction as both criminal history and an underlying racketeering offense, assigning points for both.  Guideline § 2E1.1 cmt. n.4 (explaining conduct considered part of "pattern of racketeering activity" should be treated as prior sentence if it resulted in conviction prior to last overt act of instant offense).

The listed conviction in Blankenship's criminal history, however, concerned a discrete incident regarding only 4.65 grams of methamphetamine, and the PSR listed as an underlying racketeering offense only the 2016 incident involving the $30,000 in methamphetamine proceeds—an evidently different episode than the conviction for possession of the 4.65 grams of methamphetamine.  Blankenship offered no rebuttal evidence demonstrating the conviction and the seizure of proceeds are the same event.  *See Harris*, 702 F.3d at 230.  (Moreover, even if the court improperly included the incident, Blankenship can show no harm because the

24

evidence discussed *supra* showed he otherwise trafficked more than 500 grams of methamphetamine. *See* Guideline § 2D1.1(c)(5) (applying base offense level of 30 if offense involved "at least 500 G[rams] . . . of Methamphetamine").)

d.

Blankenship also challenges the PSR's inclusion of the attempted murder of a rival gang-member (Count 1D) as underlying racketeering activity in his offense-level computation. He contends the court used the incorrect burden of proof in considering the underlying offense and applied the wrong base offense level.

i.

He maintains the court erred by treating the attempted murder as an underlying offense for the purposes of Guideline § 2E1.1 (explaining in commentary that "[w]here there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction") because the attempted murder was not alleged in the superseding indictment. He insists the alleged attempted murder falls under Guideline § 1B1.2(d) ("A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."). In applying Guideline § 1B1.2(d), our court has explained: "in the absence of a verdict or plea on those underlying 'pseudo' offenses", the court can consider underlying offenses only if "a reasonable trier of fact would find the defendant guilty of those underlying offenses beyond a reasonable doubt". *United States v. Jones*, 699 F. App'x 325, 326 (5th Cir. 2017) (citing Guideline § 1B1.2(d) & cmt. n.4).

Because the jury did not make a finding on the underlying offense, Blankenship asserts the court erred in employing a preponderance-of-the-

evidence, rather than a beyond-a-reasonable-doubt, standard to find him guilty of the attempted murder. *See id.* As noted *supra*, the court's application of the Guidelines is reviewed *de novo*. *E.g.*, *Cisneros-Gutierrez*, 517 F.3d at 764.

Blankenship's reliance on Guideline § 1B1.2(d) is misplaced. That provision applies to multi-object conspiracies. A racketeering conspiracy, however, is a single-object conspiracy. *See* 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."); *see also United States v. Carrozza*, 4 F.3d 70, 79 (1st Cir. 1993) ("In enacting RICO, Congress intended that a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single enterprise conspiracy if the defendants have agreed to commit a substantive RICO offense." (citation omitted)); *United States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008) (explaining RICO is single-object conspiracy); *United States v. Corrado*, 227 F.3d 528, 541–42 (6th Cir. 2000) (same); *United States v. Garcia*, 754 F.3d 460, 482–83 (7th Cir. 2014) (same); *United States v. Barragan*, 871 F.3d 689, 717 (9th Cir. 2017) (same); *but see United States v. Nguyen*, 255 F.3d 1335, 1340–42 (11th Cir. 2001) (clarifying beyond-a-reasonable-doubt standard applies to racketeering predicate acts in sentencing by analogy to multi-object conspiracies).

The proper provision is, instead, Guideline § 2E1.1 ("Unlawful Conduct Relating to Racketeer Influenced and Corrupt Organizations"). As discussed *supra*, Guideline § 2E1.1 applies a base offense level of 19, or "the offense level applicable to the underlying racketeering activity". Guideline § 2E1.1(a) & cmt. n.1 ("Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction".).

As also noted *supra*, the Guidelines explain that relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant". *Id.* § 1B1.3(a)(1)(A). The sentencing court may find such conduct by a preponderance-of-the-evidence standard. *See, e.g.*, *United States v. Sandoval*, 6 F.4th 63, 104 (1st Cir. 2021); *Massino*, 546 F.3d at 135. Therefore, the district court appropriately considered the attempted murder in Blankenship's offense-level computation and correctly reviewed the underlying offense under the preponderance-of-the-evidence standard. *See Sealed Appellee 1 v. Sealed Appellant 1*, 767 F.3d 418, 424 n.26 (5th Cir. 2013) (explaining preponderance means "[the fact being proved] is more likely than not" (alteration in original) (citation omitted)).

ii.

In asserting the court erred in assigning a base level of 33 to the attempted murder, Blankenship contends there was no evidence the offense would have constituted first-degree murder; therefore, the base level should be 27. *See* Guideline § 2A2.1(a) (applying base level of 27 if object of offense was not first-degree murder). As pointed out earlier, because Blankenship did not preserve this issue in district court, review is only for plain error.

Accordingly, also noted earlier, he must, *inter alia*, show a forfeited plain error, *i.e.*, a clear or obvious error. *Puckett*, 556 U.S. at 135. Guideline § 2A2.1 defines "[f]irst degree murder" as conduct that "would constitute first degree murder under 18 U.S.C. § 1111". Guideline § 2A2.1 cmt. n.1. Section 1111(a) provides: "Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a).

In that regard, there was: evidence Blankenship sent an AC member to attack the rival gang-member; evidence of premeditation; two shanks present at the scene on the body of the victim; and a puncture wound

consistent with stabbing in the back of the victim's skull.  The court did not commit the requisite clear or obvious error.

e.

Blankenship's final sentencing challenge is that the court should have applied Guideline § 3B1.1's three-level manager/supervisor enhancement instead of its four-level organizer/leader enhancement.  *See* Guideline § 3B1.1 ("(a) If the defendant was an organizer or leader of a criminal activity . . . increase by 4 levels.  (b) If the defendant was a manager or supervisor (but not an organizer or leader) . . . increase by 3 levels".).  When deciding whether a person was an organizer or leader of a criminal activity, as opposed to a manager or supervisor, a court is to consider

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* § 3B1.1 cmt. n.4.

Evidence showed Blankenship:  held the AC rank of "major" within both the Missouri Department of Corrections and the AC federal-prisons branch; ordered lower-ranking members to perform attacks; collected dues; was recognized by prison officials as an AC leader; and recruited new AC members.  In the light of the record as a whole, the court's finding Blankenship was a leader within the AC is not clearly erroneous.

2.

Chunn challenges six aspects of his sentencing, five of which are procedural:  the factual allegations in the PSR; the characterization of

ordered stabbings as attempted murder instead of aggravated assault; the four-level organizer/leader enhancement; the two-level obstruction-of-justice enhancement; and the date found by the court for the beginning of his racketeering activities. His sixth and final challenge is that his sentence is substantively unreasonable. We first address the five claimed procedural errors.

a.

As discussed *supra*, the district court must avoid significant procedural error in applying the Guidelines, such as improperly calculating the Guidelines sentencing range. *E.g.*, *Gall*, 552 U.S. at 51. Each of Chunn's procedural claims is reviewed for clear error.

i.

For the PSR's factual allegations of his involvement with the conspiracy, Chunn denies participating in any acts that included murder, kidnapping, or robbery. His appellate brief, however, almost exclusively reiterates, including without citation to authority, his filed objections in district court to the PSR. A party cannot incorporate by reference district-court assertions. *See, e.g.*, *E. R. ex rel. E. R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 763 (5th Cir. 2018). And the brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies". Fed. R. App. P. 28(a)(8)(A). Accordingly, Chunn's first claim is forfeited. *See Spring Branch Indep. Sch. Dist.*, 909 F.3d at 763.

ii.

Chunn contends the offense levels for the stabbings listed in the PSR should have been calculated under Guideline § 2A2.2 (aggravated assault), not Guideline § 2A1.5(a) (conspiracy or solicitation to commit murder).

Chunn, however, identifies only one item of evidence relating to one stabbing. He points to trial testimony stating he was upset after the brutal attack on a homosexual inmate because the stabbing he ordered was not supposed to be a murder. Other evidence, however, included trial testimony that Chunn ordered an AC prospect to stab the inmate so severely that he would be life-flighted to a hospital. One witness testified at trial that, after the prospect had stabbed the inmate at least 13 times, Chunn made him go back and "finish him out". The prospect returned to the cell and struck the bleeding inmate's head and upper body multiple times.

The court accepted the PSR's detailing of the stabbings and overruled the objection based on, *inter alia*, the PSR and trial testimony. Chunn has not demonstrated the facts stated in the PSR are materially untrue and, therefore, has not definitely and firmly convinced our court the district court made a mistake regarding the one stabbing he addresses. As for the other stabbings, he forfeits his contentions because they are not adequately briefed. *See* Fed. R. App. P. 28(a)(8).

### iii.

Chunn challenges the court's application of the four-level leadership enhancement under Guideline § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."). As discussed *supra*, when deciding whether defendant was an organizer or leader of a criminal activity, as opposed to a manager or supervisor, our court considers the factors listed in Guideline § 3B1.1 cmt. n.4 (listing factors court should consider when determining leadership enhancement).

The unrebutted facts in the PSR and trial evidence show Chunn exercised decision-making authority, participated extensively in planning

and organizing the offenses, and exercised a high degree of authority over others. *See id.* Again, Chunn has not met his burden.

iv.

In contesting his two-level obstruction-of-justice enhancement under Guideline § 3C1.1, Chunn contends the district court reversibly erred by not addressing his contention that no evidence showed he possessed a firearm when he attempted to intimidate an AC member who was cooperating with law enforcement. The enhancement does not require the use or threatened use of a firearm. Guideline § 3C1.1 cmt. n.4 ("The following is a non-exhaustive list of examples of the types of conduct to which this adjustment applies: (A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so".).

The court found Chunn had obstructed justice based on, *inter alia*: the PSR; the trial testimony of three individuals; and letters from Chunn. Chunn did not present rebuttal evidence demonstrating the PSR is materially untrue, and we are not definitely and firmly convinced the court's finding was mistaken.

v.

For this final procedural claim, Chunn contends his arrests for robbery in 2001, gun and drug possession in 2004, and drug possession again in 2004 were related to his racketeering charge, and, therefore, the district court should have listed them as relevant conduct, not criminal history. Guideline §§ 1B1.3 (outlining relevant conduct), 4A1.2(a)(1) (defining "prior sentence"). The court, noting the PSR was supported by sufficient indicia of reliability, found Chunn joined the AC on or about the date he admitted his AC affiliation to law enforcement: 18 March 2009. As rebuttal evidence,

Chunn points to trial testimony in which a witness stated Chunn was just a regular member of the AC and held no rank in 2004.

Even if we concluded the district court committed clear error by not crediting this trial testimony, removal of the relevant arrests would not change Chunn's Guidelines sentencing range. He contends his proper criminal-history category was IV, not VI as applied by the court. With his offense level of 43, however, Chunn's Guidelines sentence would be life even with a criminal-history category of I. *See id.* ch. 5, pt. A (sentencing table). In short, any error was harmless. *See, e.g.*, *United States v. Chon*, 713 F.3d 812, 822 n.7 (5th Cir. 2013) (concluding Guidelines error is harmless if it does not affect Guidelines sentencing range).

vi.

In addition, any procedural error by the district court was harmless because "the error did not affect the district court's selection of the sentence imposed". *Delgado-Martinez*, 564 F.3d at 753 (citation omitted). An error is harmless "if the proponent of the sentence convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing". *United States v. Ibarra-Luna*, 628 F.3d 712, 714 (5th Cir. 2010). After the court had extensively commented on the reasons for imposing the sentence, it stated that, even if it had erred in calculating the Guidelines sentencing range, it would have imposed the same sentence because it met the "sentencing objectives of punishment, deterrence, and protection of the public". *See* 18 U.S.C. § 3553(a) (sentencing factors); *United States v. Leontaritis*, 977 F.3d 447, 452 (5th Cir. 2020) (finding any potential error was harmless under similar circumstances).

No. 22-40619

b.

For Chunn's challenge to the substantive reasonableness of his sentence, and as addressed *supra*, review is for abuse of discretion. *E.g.*, *Gall*, 552 U.S. at 51. A within-Guidelines sentence is presumptively reasonable. *See, e.g.*, *United States v. Jenkins*, 712 F.3d 209, 214 (5th Cir. 2013).

"The presumption is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors." *Id.* (citation omitted). Because Chunn does not identify any 18 U.S.C. § 3553(a) sentencing factor the court omitted, overweighed, or erred in balancing, he does not show his sentence is substantively unreasonable.

III.

For the foregoing reasons, the judgments are AFFIRMED.